Good morning. May it please the court, my name is Ray Sheets. I'm from Cedar Rapids, two important things that I would like to begin my argument with is first, this case is here on de novo review. So the usual deference given to the district court is not present in this case. Secondly, in order to present sufficient evidence or prima facie evidence, the case law states that, quote, some evidence, some evidence that, quote, could support each element of the offense is sufficient to get the evidence to a jury. In this case, we had a 50 What's the standard of proof in the trial? I mean, is this an affirmative defense that the defendant has to establish? I think the jury instructions, once the defendant has submitted sufficient evidence, then the government has to, I think the jury instructions stated. You have to prove the duress beyond, the government has to prove the absence of duress beyond a reasonable doubt once sufficient evidence to raise the defense is raised? Yes, correct. I'm reading from the proposed jury instructions. That's what you proposed? That's what both parties proposed. Okay. Looking at the government's proposed instruction, file the document 29. Okay, go ahead. Then you want to get to the jury. Yes. So in this case, there are four elements to the coercion defense. As I was saying, the defendant in this case witnessed a shooting in Waterloo, Iowa. She reported the shooting and the identification of the shooter to the police. And that's important to note that when there was no threat made to her, she was very forthcoming and glad to cooperate. When she received the threats, that changed. She moved out of her house. She moved in with her sister because she was church. Her pastor testified that she was a very active member of the church, not only going to services, but to Bible study, to bingo. The pastor testified that it was like she had disappeared after she had received the threats. What was the evidence of the threats? The sister testified that she had received or had overheard talk at the court, stated it was part of a criminal gang in Waterloo. What exactly was the evidence? The sister of Miles said, I was at the beauty salon and what, she heard from a customer in the beauty salon or something? That wasn't clear as to who she had heard it from. Also, there was evidence that the defendant's niece had also heard the threats from people in the community. When you say the threats, what do you mean? Well, can we take it one at a time? There was a sister at a beauty salon who, from an unspecified person, heard what? Well, they heard that there would be harm done to Ms. Miles if she testified against the shooter. Now, we know that the shooter knew that she had earlier given information, given earlier identification, because in a defense exhibit A, which was a search warrant that police obtained based upon Ms. Miles' identification, her name is clearly listed in that application for a search warrant. Mr. Salas, obviously, would have received that and seen that she was the person that identified him to the police. Well, does the threat have to be more specific than that, better identified than? Well, the identified person at a beauty salon heard, I think what you're saying is somebody, I guess I didn't look at, I'd have to look at the transcript, but that's the best you can give us, is somebody at a beauty salon identify who made the threat? It's our position that we don't even have to show that there was a specific threat. There was a threat made. Does it have to rise to the level of getting something in writing? Well, no, but doesn't Harper say it's got to be immediate and it has to induce a Even if that's proven, doesn't there have to be an absence of any alternative, like go to the victim witness advocate, go into law enforcement, I mean? Sure. So regarding the first point, regarding the immediacy, the Eighth Circuit in setting forth the four things that a defense has to show, the Eighth I'm looking at Jankowski at 194. How about imminent? Imminent is the word. It's not immediate. All right. What does imminent mean? It's a question that's been in the news a lot. Imminent means it doesn't include immediate. It could mean something next week, two weeks from now, or a month from now. It does not require immediate. Going to the second point was, Your Honor, you had made the second point, Judge Ernst? There has to be an absence of other alternatives, right? I mean, duress requires you to have no legal, lawful alternative because this is no different than what the elements would be in any necessity defense, right? You start off, I've got this horrible thing that's happened to me. My choice is I either get to die or suffer serious bodily injury or I break the law. That's all this really is, right? I mean, it's the, and I know that the analysis is just slightly different, but that's the deal. And so the question becomes is why weren't there reasonable alternatives? I mean, this is a generalized threat. There's no person who's specifically identified who's going to commit it. We don't even know who made these things. I mean, and if this is enough, couldn't anybody do it anytime, anywhere? Well, regarding the failure to go to a victim advocate or go to the police, Ms. Miles testified at the evidence you're hearing that it wasn't because she thought the police would be ineffective or not doing their job. She thought that she did not have enough evidence of the threat that was made to her. So it wasn't imminent enough and it was too generalized, right? No, I respectfully disagree. Why couldn't she have simply declined to answer the questions? I mean, you know, she testified falsely as opposed to not answering the questions. If you look at what happens in front of grand juries, you know, every day, there are people that walk in and say, I ain't talking. And then everybody knows exactly what the situation is. The grand jury, they're reasonable people. They can draw inferences. The AUSA understands what happens. They get a lawyer appointed. They do some talking. They try and solve it. The false statement is very different than just declining, right? And so there are other law, I mean, I hate to call it just saying I ain't talking a lawful alternative because it's not. It could be held in contempt for that and held. But at least, you know, within the realm of what trial judges do for a living, we hear this thing all the time. And we appoint lawyers and usually they work themselves out. What she did is she just chose to lie. Well, I think the difference between this case and many of the cases that have come through the circuit, Jankowski and all the cases that we have, we have factual situations that are fantastical. I don't know if that's a word. But, for example, in Jankowski, the defendant assisted in the robbery of an armored car. He claimed that he was threatened to do so because the man he was robbing the car with threatened his sister. Well, it turns out he was living with his sister. Another case regarding dealing drugs or Harper, the Harper case that you mentioned. In that case, the defendant was accused of stealing several firearms and then stealing a Chevy truck. He claimed that a sheriff deputy put a gun to his head and threatened him to kill him if he didn't do these kinds of acts. In this case, we have evidence that is uncontroverted that the defendant, knowing or gladly cooperated with the police at the beginning. She received the threats, no matter how specific or general they were, I would hesitate to say that in most cases where threats are made, they're sent by letter or text messages. Or made that explicitly. In this case, we have a woman who was so fearful of what happened, of the threats that she received, that she moved out of her house and that she quit going out in public. So, and this wasn't a case where she believed that the police would have not done their job. She didn't have enough evidence of the threats that significantly affected her life. The case law shows, and I'm running out of time, as I started, the defense has to only show that there was some evidence. And I think that we did that in this case. Thank you, Your Honors. Thank you for your argument. Ms. Williams, we'll hear from you. Your Honors, Lisa Williams here from the Northern District of Iowa, appearing on behalf of the United States. I think that the panel really hit upon the key issues in this case. I do want to spend a moment on the standard of review. We agree that it is de novo. I know that the defense brought up in their brief a perhaps improper burden applied by the district court. The difference between the prima facie standard and the preponderance of the evidence and the government's position is because it's de novo review here, even if the district court improperly applied the wrong burden of proof, that does not require remand. This court reviews the issue de novo and under... What is the correct standard? It is a prima facie showing, Your Honor. The defense only needs to make a prima facie showing before the trial court. How much, how would you define that? It's less than a preponderance. And how much is it? Is there any further refinement you can give to that term? I don't think that there's any technical refinement. I mean, I always think of it as a football field. And so I think, you know, 20 yards. I mean, it's something. It's certainly not preponderance. It's not reasonable doubt. I mean, it is not a tough, it shouldn't be. It's one of the least standards of proof out there, but it's something. You do have to prove something to entitle yourself to this defense. Well, don't you just need to establish one fact on each element? I mean, it could be controverted to just say, I have some evidence on each prong of the, whatever the elements of the defense are. I would agree with that, Your Honor. But in this case, the defendant failed to prove any evidence with respect to the eminency of the threat and the reasonable legal alternatives. Let's talk about what these threats were that she overheard. Her sister, or excuse me, Ms. Miles herself testified. And she said her sister came to her shortly after the incident and said that she heard from Salas's sister and mother that something was going to happen to her. If she, and her family, if she snitched. So that's one source of a threat. Then in a subsequent event, her sister was at the nail salon and overheard some girls talking that something may happen to the defendant if she was a snitch or if she cooperated. That is the entirety of the threats that we are talking about. And they happened in January of 2017 or earlier. Ms. Miles was served with her grand jury subpoena in March of 2017 and appeared to testify before the grand jury in April of 2017. So there is a three, approximately three month gap between when any of these threats took place and her coming, her receiving notice that she was going to be required to testify at grand jury. And then her ultimately coming to grand jury. There is no immediate threat in this case. She is, and I would go back to the Blankenship case from this circuit. That was the one that really struck me as if you're going to give a defense, Blankenship really would have been the time to do it. This is a guy who opens his door in the middle of the night and there's four people there. One of them is a man, he's intoxicated. He starts threatening Blankenship saying, I want my money that you owe me. This man has a reputation for violence. He's known to carry knives. Blankenship says, just a second, closes the door and then runs out of his trailer over to his dad's house, gets a gun, comes back and he shoots the guy who's threatening him and his family. That man doesn't get the duress or coercion instruction in part because the threat wasn't immediate enough because the court found that he had time to put on a pair of pants, leave the trailer and go to another residence. So if that is not immediate, there is no way that a delay of three and a half months can rise to this level of immediacy. What's the three and a half months? From the time that these threats were made. Oh, but the threat was if you testify, supposedly the threat was if you testify, so they wouldn't kill her before she testifies. Well, it was if you cooperate. I don't know if there's a distinction between the two. They didn't know that she had been subpoenaed to testify and she had already cooperated. She had already cooperated with police before those threats were made and she wasn't harmed from that prior cooperation. But the issue here is her testimony in the trial, right? Not her cooperation earlier. At grand jury. Grand jury. Yeah, grand jury. You're saying she had already testified at the grand jury at that point? No, no, your honor. She had cooperated informally. The night of the shooting, she gave a statement and then she was outed. I mean, they put her name in this search warrant and so she was exposed as a cooperator in December to the community. The other serious problem is, of course, the availability of reasonable legal alternatives. This is a person who, and the case law has suggested that a defendant has some sort of obligation to proactively go seek police intervention. This woman had two opportunities where she was talking to police about this. She didn't have to go and reach out and seek police help. It was presented to her right then and there. When she was served with her grand jury subpoena, they had called her and asked her to come to the police station. And she did. And they served her with the grand jury subpoena at that time. And she did not say anything to police about her concerns of testifying. And then, of course, when she showed up for grand jury, she spoke with an FBI agent before going into the grand jury room and didn't raise any concerns. In fact, if you go back and look at her testimony from the motion hearing, you will see that what she told the FBI agent is that she spoke with her pastor and had a kind of come to God moment where she could no longer lie about the shooting and that she needed to tell the truth and that the truth is that Eric Salas had nothing to do with it. Miss Miles is just a liar. She went into grand jury, she told that same story, and she lied about a 17-year-old kid who was shot. Now, Mr. Sheets presents a lot of reasons that she was lying, that she was fearful for her life. Other than her testimony, that's just an inference that he argued before the district court and before this court. The man who shot, the man who did the shooting is her daughter's boyfriend. Her daughter is pregnant with his child, and she has a lot of reasons, other than fear, to maybe not want him to go to federal prison. And I think that it's one thing when the state's involved and when the federal government comes in with a grand jury subpoena and now your daughter's boyfriend is looking at serious time, maybe you do have a motive to fabricate your story at that time that is not at all based on a well-grounded fear of threatened behavior. Just to clear one thing up, you did talk a number of times about the immediacy of the threat. That is exactly the language that was used in Harper by this circuit, wasn't it? That's correct, Your Honor. And so the claim that it's not, because I'm looking at it, it just says an immediate threat of a nature sufficient to induce a well-founded or well-grounded apprehension of death or serious bodily injury. That's correct. And Harper also says that a prior threat and then a generalized fear going forward is insufficient. That is insufficient to create the necessary facts to support a coercion or duress defense. And I would submit that's exactly, if you want to construe in its best light the conversation at the nail salon as a specific threat, that's a specific threat, but then a generalized threat moving forward, and that's the prior threat, generalized fear moving forward, and that's insufficient to trigger entitlement to this jury instruction. And so the defendant just failed to meet her burden, to make this prima facie showing that there was a eminent specific threat and or that she had reasonable, she did not have reasonable legal alternatives available to her. I'd also like to spend just a few moments on the guideline range calculation argument. I know Mr. Sheets didn't have time to address it. Davis is on all fours here with respect to the base offense level calculation. Literally the exact same circumstances and facts. The only issue that Davis doesn't address is whether or not this defendant knew or should have reasonably known that the facts underlying the four level adjustment, the specific offense characteristic 2K2.1B6B for Salas' possession of the gun in connection with another felony offense. And the plea agreement language makes clear that she knew that Salas shot Tyran, and so he assault while displaying a weapon. What she argues, though, is that she had no idea if the shooting was justified or not, and so you cannot apply that specific offense characteristic. The government submits that that argument is akin to trying to collaterally attack a prior conviction and shouldn't be available to her. I thought the issue was her knowledge, though, not what the guy was convicted of. Well, she frames the issue as, I think that she admits based on the record that she knew that Salas shot Collins, but what she doesn't know is if the shooting was justified. And she argues because the government didn't establish that the shooting was justified, that specific offense characteristic 2K2.1B6B was not a valid offense. Specific offense characteristics should not have been applied. Her plea agreement that she signed and executed and the unobjected two facts in the PSR really do establish that she's, quote, well as the defendant, quote, was leaving, T.C. entered the residence and Salas fired multiple shots at T.C. So that's what she stipulated to in her plea agreement. It was in the PSR as an objected to, and so I think that there is sufficient evidence that she knew that Salas shot Tyran in the house. So to kind of overcome the knowledge hurdle, what she's arguing on appeal is that she knew that the shooting happened, but maybe it was justified. Maybe Salas didn't commit a crime when he was shooting at Tyran, and because it could have been a justified shooting, it would be improper to apply that specific offense characteristic. And that's why I characterize it really as a collateral attack on the prior applied specific offense characteristic, because that was applied in Salas's guideline range, that he possessed the firearm in connection with the shooting. And so what the defendant would like to do is kind of go back and attack that prior adjudication. So much like a defendant cannot collaterally attack a prior conviction in a PSR. I was convicted of this in state court five years ago, but I really didn't do the crime. We prohibit that. That's not allowed. She should not be able to go back and collaterally attack the conclusion from Salas's district court case that he possessed the firearm in connection with another felony offense. That issue was litigated in Salas's case. He was represented by counsel. It was before a district court judge, and that judge determined that Salas did in fact possess a firearm in connection with another felony offense. There is no justification defense. There is no reason why he legally did not violate those other laws. And because of that, because we've already adjudicated this, the only thing that the government has to prove is that she knew or reasonably should have known that those facts took place. Well, which facts took place? That Salas shot at Tyrant. That he committed the crimes of, under Iowa law, of assault by assault causing, I believe, serious bodily injury. Right. And she says she didn't know that because she didn't know whether the shooting constituted an assault. Correct. Because maybe he was justified in shooting. She tries to put forth this affirmative defense. Right. But why is that a collateral attack? I mean, if she hadn't known there was a shooting at all, it wouldn't be a collateral attack. Correct. How is that any different from her knowing that there was a shooting but not knowing whether it was a crime? Well, she's trying to step into Salas's shoes and claim that he did not commit a crime. That has already been adjudicated in Salas's underlying federal offense. I understand that's what you're saying, but I'm saying, what if she's not saying that? What if she's saying, I'm not disputing he committed a crime. I'm just saying, when I testified in the grand jury, I didn't know that he had committed a crime. If that's what she's arguing, then her plea agreement and the unobjected two facts in the PSR clearly establish her knowledge that, I mean, that this crime took place. Okay. What is it? Those facts? Because she knew that the guy had come out of the house saying that Salas just shot me? Well, she said, as she, quote, was leaving, Tyran Collins, TC, entered the residence and Salas fired multiple shots at TC. She stipulated that she knew that. That's from her plea agreement. Yes, Your Honor. Okay. Thank you for your argument. Thank you, Your Honor. Mr. Sheets, we'll hear from you in rebuttal. Thank you. First, regarding going back to the immediacy. And Your Honor, I did look at the Harper case. It does, in Harper, it does use the language immediate threat. But in looking at the government's brief, when the government set out the four things, even the government never uses the word immediate. I don't know if it matters much whether it's immediate or it's imminent. Yeah. Did you figure out whether there's a difference between immediate and imminent? I think there's a significant difference. You do? Well, I don't think Judge Doty did when he wrote the opinion in Harper. But whatever, that's fine. Imminent means not immediate. It could include immediate, but it doesn't mean immediate. Secondly, the Blankenship case that the government relies on, saying if there was an immediate in that case. Well, when you look at the actual holding in that case, I mean, the Eighth Circuit clearly stated that, quote, Blankenship recklessly placed himself in this situation. Well, that doesn't get a coercion defense. Quote, he did not have to open the door, go outside. Once again, Blankenship could have remained there, but instead he chose to slip out back, go to a nearby trailer, retrieve a shotgun and return. So that case doesn't. Well, wait a minute. How is that really so significantly different? Why did she have to lie under oath? I mean, because the idea is you have no lawful alternative, right? I keep looking at it. I mean, you know, and I just don't get the, well, I didn't have enough evidence. Therefore, I couldn't go to the police. I mean, it doesn't make sense. What about the option of just not disclosing that you testified in a grand jury? Yeah. Because it's a sealed proceeding. All right. I don't know if any of you are movie buffs, but Godfather Part Two, there was going to, have any of you seen that movie? Godfather Part Two. There's a classic part of that movie where the witness was coming in to testify against Corleone. It's an important witness. And he had given sworn testimony, sworn affidavit. And as he's sitting down to testify, in walks in Michael Corleone with the witness's brother. That's in a public Senate hearing, though. There's no threat made in a grand jury. There's no threat made. None. No threats were ever verbalized. No gesture was ever made. So the fact that the court requires some kind of specific direct threat, that doesn't happen in a lot of times. And I use that example with some hesitation because I know it's fiction. But it gives the example of, there doesn't have to be a text message, or as the government wanted, some message in social media. It can be a general threat. And I think in this case, where we have the subsequent actions of the defendant, and moving out, and not going out in public anymore, the threat was real. All right. Thank you for your argument. The case is submitted, and the court will file an opinion in due course. Thank you to both counsel. Thank you.